Good morning, Ms. Payton. Good morning, Your Honors. Gwendolyn Payton on behalf of Premera Tableau Software and Salesforce. I'd like to reserve six minutes for rebuttal today. This is a case about the ERISA process working and the ample due process that was afforded the members and the plan coming to the correct decision both medically and legally. There are two facilities at issue, Second Nature and Catalyst. Each claim received multiple levels of review done by an independent child and adolescent psychiatrist, multiple ones, who had no affiliation with Premera. And although the members did decline the federally mandated independent review for Second Nature, they did get it for Catalyst, which also affirmed Premera's was correct. Let me ask you this. Why didn't Premera abuse its discretion by not meaningfully explaining why it granted coverage for the first 30 days of AB's stay at Catalyst but not the remainder of his stay? It is very common for plans to allow upon admission coverage, and that is for the benefit of the member. It is a dangerous and unprecedented decision by the district court to say that that was somehow a stopple. There is no authority for that at all. What Premera did was allow the records to be developed and then take a look at it after that 30 days and then found there was no medical necessity. Under the plan, the claim was never covered, but the plan allowed coverage for the first 30 days for the benefit of the member. You mean the plan, the language of the plan itself did? No. The plan in its discretion allowed those claims to be paid. Let's just say, arguendo, that we agree that you could have said, you know, we made a mistake, but you didn't do that. You didn't explain why 30 days was okay, but the rest was not. Isn't that a failure that bears on our decision here? It absolutely does not, and you won't find a single case that allows that, and you'll find in the briefing there's a couple of cases that deal with that scenario, and for public policy reasons, what we don't want to encourage is denials, because the plan then thinks, if I pay for it before I have the full record and give the benefit of the doubt to the member, which is what they did here, that I am going to somehow be a stop from later raising concerns about medical necessity. That's the way our claim system works, where we have claims need to be adjudicated fast under ERISA, or else there are penalties, so the plan goes forward, pays it, later does the assessment, and sees this wasn't covered. At that point, the plan has discretion. They can say it was never covered, pay the money back, or it can say, we're going to give you the benefit of those 30 days, but going forward, we're not going to pay. And that is allowed under the language of this plan, and this Court reviews Premier's discretion on these issues, and then all of the adjudications for abuse of discretion, and it clearly is not that. Well, shouldn't the plan at least explain, if they're asking, why haven't you paid me since you paid the first month, don't they have a duty to explain to them why they haven't done that? Well, they did do that, Your Honor. So the letters that come back from the plan after the medical necessity review is actually done are robust and full, and there's multiple levels where they explain what the problems, plural, are. Did they ever explain to them, sure, we paid the first month, but this is why we paid it, and this is why we're not going to pay it any further? They explain why they aren't going to pay it further, for sure, with a lot of details. They don't say that we paid the first month because we made a finding of medical necessity. That is an administrative allowance that they do, and there is nothing to explain because they didn't do the medical necessity analysis. I think the question is, why didn't you explain? I mean, that's the meaningful dialogue. They said, why did you pay for the first part, not the second? And I don't see an explanation or response to that. Is there one? There was never. Except to quote the policy language. The plan never made a finding that the first 30 days were medically necessary, and in fact, they give the member a lot of information about that when they say there's no psychiatric evaluation at intake, there's no discharge planning at intake, you're not seeing a therapist three days a week. We can see that because of the first 30 days that we gave you the benefit of. We can see that you're not having the things that are required under the plan to be covered after those first 30 days. So the question is, what do you do with the fact that now the plan has been very thorough in giving the member and the facility the benefit of the doubt, and after 30 days of medical records realizes this is not medically necessary and it's not covered under the plan? But what you just said was never communicated. But it was communicated. You're asking the people to read between the lines. I mean, I just don't see anything saying, by the way, here's why we paid the first portion and why the second portion we're not paying is different. If the plan was required to say, we did it because we have to adjudicate claims within a certain number of days within ERISA, and we don't necessarily have the ability to get to every robust appeal within that time, and what we're not going to do is penalize the member when they're in ongoing care by doing take-backs of those things. The reason the plan didn't address it because it had no intention of taking that money back from the members, what they were saying, look, you have this. Going forward, here are the issues that are keeping this service from being covered under the plan. And when they did that, they were actually very clear and thorough about the entirety of the say and the problems, and the problems went back to day one. What they don't need to do and what they don't do because they didn't think that they were going to go back and do the take-back from the member was say, it was covered during this time or it wasn't covered during that time. The issue under fair and meaningful dialogue with a member is about the things that are going to harm them, not the things that they got. You don't need to go back and say, we paid your medical services in the past because of X, Y, and Z. What you need to do is hone in on what is the issue before the member, which is, we're not paying this claim, here's why, here's what the problem is. If you want to appeal, here are the issues that you can express with us, and you see that robust dialogue happen on the issue that matters, which is the denial of claims, not the grant of the claims. Let me follow up on my colleague, because I don't see an explanation regarding the recommendations of Glissmeier and Wood, why those were insufficient to show the medical necessity standard was not met. There was no robust discussion at all, was there? There was no discussion in those letters, do not address the issue that was before the administrator at the time, which is, does the child, at the time it is confined in the 24-7 lockdown facility, the residential treatment center, need that level of care? And number two, can the child be safely treated at a lower level of care? So the discharge summary only says the child would benefit from a residential or therapeutic boarding school going forward, not the issue. There's nothing in the discharge that talks about whether or not a lower level of care would be sufficient. And the letter from the therapist, the therapist hasn't even seen the child for months and months prior to the time, and that letter is written four months after the child is put into the facility. So the question you ask is, why not say those letters don't address the issue? Under ERISA, the law is very clear, and I'd direct the Court to a recent opinion out of the Tenth Circuit, E.W., that addresses this very issue. And it says when provider letters or treating letters are not addressing the issue, the plan does not need to address them affirmatively. It needs to address the salient issues. And particularly when the . . . Doesn't that raise an obligation to explain to them why they're not considering those reports? But they don't. I think if you look through those appeal letters, you will not find a single question about either the discharge summary or the letter from the therapist. The issues that the members raise are mostly legal issues, and they're issues about the wilderness program being an exclusion under the plan. And they do not ever say, well, what about something the therapist would said or the discharge summary said. That is absolutely absent from there. And so what you have here, it's like E.W., where the Court found that when the letters are not on point, the plan doesn't have to go through other than read them and take them into account in the totality, but doesn't need to address them back. You won't find any question about those letters that the plan failed to raise. That was in a case where the letters were basically irrelevant. That wasn't true here. You say the timing was different, but they were talking about this particular covered person, right? The letters in E.W. were about the particular person, but they were irrelevant in the same sense. The question the administrator is answering is this. Do you meet the criteria under the InterQOL criteria? Do you have that level of symptomology right now that would require your confinement at this level of care? And number two, can you be safely and effectively treated at a lower level of care? I promise you, when you look through those two documents, you will not find anything that addresses that issue. That's the problem, at least that I have, and I think maybe my colleagues, is it seems to me, at least under ERISA, the plan administrator, whether they agree with the plan beneficiary or not, have an obligation to explain decisions that are relevant to the plan beneficiary. That doesn't seem to have happened here in a couple of instances with respect to, say, the 30-day situation as opposed to later, and with respect to Glissemeyer and Wood. It's just kind of like, hey, we see it, goodbye, no problem. And I gather your position is the plan administrator is not required to respond any more than it did. Is that correct? That is absolutely right. And you won't find any authority to the contrary because what the plan administrator is doing is using its discretion to interpret the terms of the plan on the issues that are causing the denial, okay? And that is what the plan does here very well. It says exactly why they're saying no under the terms of the plan. For second nature, it says you are, you, this is an excluded service, and they give detail about that. Under the catalyst, they say you do not have the symptomology that rises to the level to require you to be placed in this level of confinement where you need 24-7 care with nurses on staff watching you full-time. You can be safely treated, and they go through the symptoms that are absent. And the nice thing that I like about that EW case, they talk about this situation where the denial is based on the absence of symptoms. When the plan is saying these things aren't here, what they don't have to address is things in the record that may say there are other issues, and certainly they were here, but those aren't the issues that we're looking at here. And they're not the issues that led to the denial. The plan is crystal clear about what the issue is, and here's what happens in the appeals. The members don't address those issues. They don't come back and deny that, first of all, the level of service isn't being provided at the facility. They never contest that claim. Nor do they come forward with evidence that those symptoms that are required under interqual were actually present. Those are the ERISA issues. Those are the fair and meaningful dialogue issues that the plan was required to do. What the plan doesn't have to do is address every extraneous issue in the ecosystem of the child. It would be unreasonable for the efficiency of the ERISA process to work. You want to save your time? Yeah. Thank you. Very well. All right. Mr. King. Good morning, Your Honors. Brian King. May it please the Court. This is an interesting case involving a very sick young man. I want to, the Court spent most of its time on the catalyst claim, and I want to revisit that myself. This is a situation where, as the Court notes, we had a circumstance where the first 30 days were paid, and then the denial letter that came after that raised some specific, what we've referred to as a facility-specific or intensity-of-service objection. They said there weren't certain things that were happening in terms of the specifics of the treatment that were being provided to this young man at the facility. There was an appeal by the family on December 20th of 2019. That's at the record at 3 ER 157 through 170. And you can, I know that the Court is aware of this because you've asked questions about it. These are extensive and very detailed appeal letters. This family had a claims advocate, health care claims advocate, helping them with this. And they asked many questions. They provide information about how and why the services were sufficient at Catalyst to qualify for coverage under the plan. But perhaps most importantly, for the first time after 30 days, there's this comment about, well, now we say that the intensity of services at Catalyst weren't sufficient to get coverage from the plan. The problem is they'd already provided 30 days of coverage, and they never came back and said, we made a mistake, we want that money back. Let's say, let's say, argue when, though, they had done that. Let's just say they had said, you know, we paid 30 days under a plan. We didn't have to do that, but it was a mistake. Going forward, we're not doing it. Would that have been okay? Well, I think it certainly would have explained their behavior more in the sense of providing some explanation for why they were denying it and that there had been a mistake made. But the reality is that the family provided information in that appeal letter in December of 2019 to say, you're wrong. This is a licensed facility. They have many therapists and individuals providing clinical services. There's no question this child is getting the services that he needs. And they said in that appeal letter, let us know if this continues to be an issue. And the next denial letter that comes down shifts the denial rationale. It moves to lack of medical necessity. And that's important, because as we argue, and you know this, we believe that Premier abandoned any ability to come up and argue that there is an intensity of services reason for denying this claim or that there is a facility qualification reason to deny this claim. And there is good case law, which we cite in the briefing, to say you can't just willy-nilly jump from one denial reason to the other, receive information from the family or the claimant about why the first denial reason that you raised is not valid, move on to some other denial reason, and then expect the family to think that the initial denial reason is still in play and is valid, especially when you see the family, as we did in this appeal letter in December 2019, making real effort, providing specific, substantial information as to why this intensity of service or facility eligibility argument was not valid. So let me ask you this, of course, we're dealing with an ERISA covered plan. We're not dealing with a court. There's some set rules about, you know, waiver, set rules about forfeiture, and what happens if somebody doesn't respond. It seems we have a slightly different context here. Your opponent seems to take the position that the insurance company deals with the family in this case just like, you know, like a bunch of lawyers, and saying, you know, look, there's no medical necessity here, end of story. I gather your position is, no, if the family has raised an issue, the plan has an obligation to address what the family says, and if they don't do that, in effect, they're estopped to deny that. Is that a fair statement? I don't really like the word estoppel. Okay, let's say they're stuck. Yeah, what is becoming clear, and I see this in the Fifth Circuit, we see it in the Tenth  The Ninth Circuit says this, too, in Saloma and Boonton. You have an obligation to carry out a meaningful dialogue, and the reason for that is we want to get rid of as many cases as we can when there's a dispute before we have to go to the federal judiciary. You don't want to deal with these cases, and the only way, the best way of ensuring that the number of cases that are presented to the federal judiciary is to ensure that there is a meaningful dialogue between the parties so that individuals who may believe that there's coverage, and there really isn't a basis for coverage, understand why their claim has been denied, and they don't feel, because they've been stonewalled, like they have to go to federal court and hold the insurer accountable. So it's critically important, and I think more and more federal courts, both at the circuit and the district level, have been realizing this lately. It's very important that the insurers and the plan administrators' feet be held to the years. Of course, Boonton is over 25 years old. So one of the things that we need to do is make sure that insurers do that. So you have to look at the appeal letters, and if you look at the appeal letters in this case, I think there's no question that, contrary to what Ms. Payton indicates, these issues, whether they're intensity of service or facility qualification issues, or whether they're medical necessity issues, were raised. Ms. Payton said, for example, that there were no clear indications that the treatment at Atlas was necessary and that the treating physicians had said it should be provided. Look at Dr. Glissmeier's recommendation, his discharge summary from Second Nature. He says a return by AB to his home environment, quote, even with intensive outpatient therapy or school accommodation, would almost certainly result in significant regression and a return to his previous level of functioning. Let me ask you this. You switched over to Second Nature. I was going to get to that in a minute. Second Nature's own materials call it a, in quotes, wilderness program. The plan excludes wilderness programs. So why was it an abuse of discretion in that case for Primera to exclude any coverage or stay at Second Nature? Thank you, Your Honor. It's a great question. Of course, that goes to the core of what Second Nature's issue is. And here's the answer. Because the stuff that is in the plan that talks about an exclusion does not talk about anything to do with therapeutic services. And the district court got it right in saying there was never any attempt by Primera to connect the language of the exclusion to the fact that Second Nature was different. It was a licensed outdoor behavioral health care center. It was licensed as an outdoor youth treatment center under Utah law. And Utah law makes it very clear there is a significant therapeutic component to this. This is not like going out and enjoying a camping activity or a wilderness activity where the healing properties of nature, which we all recognize are real, are experienced by people. It's not recreational. It's therapeutic. And that's the difference. So you're saying that if a wilderness program, a program calling itself a wilderness program, offers therapeutic services, it takes it outside the definition of wilderness program? It takes it outside the language in the plan. One of the things that the district court noted is this reference to wilderness program, quote unquote, in the plan is never defined. Primera makes no attempt to make the distinction that we're talking about here. And the district court noted that and said, you know, there's a big difference between going on a camping trip or going on a tall ships trip or an outward bound kind of a thing where there's no therapeutic experience specifically to the individual's needs by clinicians as opposed to what we've got here with Second Nature. There's also an exclusion for recreational programs. Yes. It looks to me, and I'm trying to understand this, the only difference between a recreational program and a wilderness camp exclusion program is that the wilderness camp offers some sort of therapeutic? Yes. Well, Utah law, when it defines outdoor youth treatment programs, says specifically these are not recreational programs. So they're drawing the distinction under Utah law when they license these facilities to say this is very different in our perspective in Utah law than a recreational program. Doesn't the language of the plan exclude both wilderness and recreation? No. And that was something that the family did a good job in their appeal letter of saying to the folks at Primera is they said we fall under the definition of quote provider unquote. And they never got a response from Primera to that argument. They said look at the language of quote provider unquote under the terms of the plan. We fall under that. So a wilderness program can be a provider under that? Totally.  And the reason it's a provider because it offers therapeutic services? Yes. It's a clinical therapeutic program. And that's something, again, Your Honor, that was raised specifically going back to the argument that we were talking about before about a meaningful dialogue. That was raised by the family in connection with the appeals for Second Nature. Never did Primera come back and address that, say one thing about that. They never denied that it was a quote provider. Well, they did offer to pay for the therapeutic part of the services. Is that something that's doable? Do they break down their services by the cost for the therapeutic part and the cost for the? It's a good question. I've been doing this work for a long time, Your Honor. And what you're referring to there is called unbundling. It is referred to as you have certain bills for certain types of programs, an inpatient program like this, that are provided and expected to be paid and routinely paid by insurers on a per diem unit basis. Now, sometimes you will have insurers say, like Primera did here, well, we're not going to, we don't buy the idea that wilderness treatment, wilderness programs are covered. So we're going to do, as Primera did here, we're going to let you submit individual claims. That is an improper behavior from a billing, healthcare billing perspective, number one. But number two, it really makes this distinction that we've been talking about, Judge Reyes, an important one, because Primera knows. When they said that, they were implicitly admitting they knew that this program was providing therapy. They knew that it was something other than going camping or just going out into the wilderness and enjoying the healing properties of nature. They knew that it was a therapeutic experience. And they chose not to cover it as a program. And the court, the district court said, you could maybe choose not to cover it and say to individuals like this family, we're not going to cover those programs, but you've got to make it clear and explicit. And that's how the judge faulted Primera in this case, that the language of the plan itself simply does not make clear the distinction that we've been talking about between a recreational program or a camping or a wilderness program that hasn't... My question was though, can you unbundle it and submit the bill separately? That's not proper. Why do you say it's unproper? I mean, people deny claims partially all the time. So what's your authority for saying you can't unbundle? It's beyond the scope of the briefing in this case, Your Honor, but... That's okay. Yeah, I can tell you this, the unbundling aspect is problematic because you either need to take the facility and its per diem charges as a whole and pay them or deny them. To unbundle them suggests inconsistency in how you view the facility. It's saying, as we were discussing, yes, there are some therapeutic elements to this and we'll pick and choose what we want to pay. And then we'll have other aspects of the services that we won't pay. So these services that are provided on an inpatient basis for, and charged on a per diem basis, are acknowledged and well accepted within the health care billing field as properly being billed on a daily basis like that. I can't tell you more than that. You mentioned Utah law. What role, if any, does Utah law's take on second nature play in this case? Yeah. Well, I think it's an important role because it makes this distinction, Your Honor, Judge and the language of the plan that talks about recreation or talks about camping or talks about tall ships, talks about wilderness. That is the clearest indication, Utah law, that there's a difference in terms of a wilderness treatment program that is licensed under Utah law as a therapeutic provider. So if I'm understanding you correctly, you're saying that because Utah law defines what some of these terms mean, and in this case, second nature is licensed under Utah law, that PREMERA is bound for definitional purposes by Utah law. Is that right? Well, I think that's a fair statement, Your Honor. For purposes of evaluating whether second nature is a, quote, provider, you look at the language of provider in the plan, they relate to, it talks about licensure. Well, you've got to look at Utah state law or whatever the relevant state law is to see if they're licensed. So there's a relationship between evaluating licensure and evaluating whether it's a provider. I guess my point is, let's say Utah law says that a particular thing, it means XYZ, PREMERA is a big plan. They have a lot of different states, but you're saying that to the degree second nature is involved here, PREMERA is bound by Utah law's definition of XYZ. Is that right? When the terms of the plan explicitly or implicitly refer to state law and say, in order to be a provider that's covered under our plan, you have to be licensed. Well, what that means is you've got to look to state law to see, well, are they licensed or not?  Okay. Any other questions by my colleague? Thanks very much.  All right. So Ms. Payton, you've got some time left. Utah licenses residential treatment centers. The plan covers residential treatment centers. It does not cover wilderness programs. Second nature is licensed in Utah as an outdoor behavioral program. It doesn't have the right license. That's the role of Utah. The wilderness exclusion decision that the district court came to was that because they also offered therapy, they weren't a wilderness program under the exclusion, which would absolutely nullify the exclusion. Why would the exclusion be in there? That argument also violates the rule against party presentation because it was raised by no party at any point in the proceedings, both administrative and in the district court. It is absolutely true that the facility can submit the therapy claims or any medical services that occur at the facilities, both Catalyst and Second Nature, as individual claims, and there's nothing contrary to that in the record, nor is it true. I understand they can do it, but if they were to go to the facility and say, we need these broken out, do you know if that happens? It does happen. In this record, look at the member's response on level two in the Second Nature appeal where they respond to Primera's offer on that, and they say it is insulting and it's condescending. That is their response. So you're saying you acknowledge that there's therapy that's provided at this program, simply because it's a wilderness program and it's set in the wilderness as opposed to a hospital room, that you won't provide, is that what it is? What we won't do is pay the room board in tuition at the facility. What we will do is the medical services, but we will not pay the tuition for wilderness services, and there would be no need for an exclusion if it wasn't arguably sometimes maybe providing things that were covered under the plan. The plan only covers medical services. The exclusions are for things that might include some medical services but are not otherwise covered. A great example is the case from this circuit about the clinical trial exclusion, where — Thank you for answering my question. Thank you. Okay. Your time is up. Thank you. Thank you both for your argument. We appreciate it. It's an interesting case. The case of B. et al. versus Fermat of Blue Cross et al. is submitted, and the court stands adjourned for the day. All rise.
judges: THOMAS, SMITH, Rayes